**TRENK, DiPASQUALE,
DELLA FERA & SODONO, P.C.**
427 Riverview Plaza
Trenton, New Jersey 08611
(609) 695-6070
(609) 695-6071
Andrea Dobin
Ross J. Switkes
*Counsel to Andrea Dobin, Chapter 12 Trustee*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>ANTHONY M. MORTELLITE, JR. and COLLEEN MORTELLITE,<br><br>Debtors. | Case No. 17-21818 (ABA)<br><br>Chapter 12<br><br>Honorable Andrew B. Altenburg, U.S.B.J. |
| In re:<br><br>BLUES BROTHERS, LLC,<br><br>Debtor. | Case No. 17-21820 (ABA)<br><br>(Jointly Administered) |

### OBJECTION OF ANDREA DOBIN, CHAPTER 12 TRUSTEE TO CONFIRMATION OF CHAPTER 12 PLAN

ANDREA DOBIN, Chapter 12 Trustee, by and through her undersigned counsel and by way of objection to confirmation of the proposed Chapter 12 Plan of Anthony M. Mortellite, Jr. and Colleen Mortellite (the "Individuals") and Blues Brothers, LLC ("Blues Brothers," and collectively, the "Debtors") states as follows:

1. On June 8, 2017 (the "Petition Date") filed voluntary petitions under Chapter 12 of the Bankruptcy Code. Andrea Dobin (the "Trustee") was appointed to serve as the Chapter 12 Trustee for the Debtors shortly thereafter.

2. On June 22, 2017, the Court entered an Order authorizing the joint administration of the Debtors' cases. Docket No. 26.

3. On September 6, 2017, the Debtors filed their Chapter 12 Plan (the "Plan"). Docket No. 79.

4. On September 29, 2017, following the September 28, 2017 deposition of Mr. Mortellite (the "Deposition") and the deposition of the Debtors' appraiser, discovery closed.

**Administrative Concerns**

5. Plan Structure: The Debtors have not substantively consolidated their cases, but have elected, instead, to submit a single Plan.

6. Disbursing Agent: Mr. Mortellite proposes to be the disbursing agent for every payment due under the terms of the Plan. By not allowing the Trustee to disburse any funds, the Trustee is deprived of a commission and, thus, any compensation for serving.

7. This Court in LaRosa Greenhouse, LLP, Case No. 15-30672 (ABA),[1] entered a Confirmation Order that directed that (i) Chapter 12 Trustee served as disbursing agent for all monies disbursed to general unsecured creditors and priority tax creditors under the plan; and (ii) the Chapter 12 Trustee receive a five (5%) percent commission from all monies disbursed from her. Case No. 15-30672 (ABA), Docket No. 115.

8. In LaRosa, due to the absence of precedent at the time that addressed this issue, the Trustee requested that the Court adopt the position explained in Matter of Kline, 94 B.R. 557, 560 (Bankr. N.D.Ind. 1988). The Kline Court held, after an extensive treatment of the issue that priority claims, unsecured claims, secured claims that will be satisfied during the life of the plan

---

[1] The LaRosa case involves the same Debtors' counsel and bank making a citation to the Court's decision in that matter particularly relevant.

2

and cure payments must be paid by the Trustee and that other payments may be outside the Plan. Beyond implementing a payment arrangement for the Chapter 12 Trustee, utilizing the Chapter 12 Trustee as the disbursing agent enables the Court and parties in interest to be certain that there is oversight and assurance as to the Debtor's compliance with the terms of the Plan.

9. The Trustee respectfully requests that, as it did in LaRosa, the Court direct that she serve as disbursing agent under the Plan and receive a five (5%) percent commission on distribution to creditors.

**Claims Issues - Administrative Claims**

10. Chapter 12 Trustee Commission: As drafted, the Plan provides for no compensation to the Trustee because the Trustee's compensation is dependent upon receiving and disbursing plan payments. As structured, the Trustee will not be receiving any payments under the Plan. The Trustee herein is not a "standing trustee" and, thus, must have her commission set by the Court. 11 U.S.C. § 326(b). A recent case warned that a failure to adequately compensate a case-by-case Chapter 12 Trustee would cause the U.S. Trustee to "lose a substantial incentive in recruiting competent individuals to serve as Chapter 12 case trustees." See In re Daniels, 2016 WL 556361, at *3 (Bankr. W.D. La. 2016)(Norman, J.). This structural problem cannot stand.

**Claims Issues – General Unsecured Claims**

11. The unsecured claims list disclosed in the Plan is now outdated. The Debtors have not stated whether they intends to object to any of the claims that have been filed. In order to determine the responsibility for claims review, i.e., the Trustee or the Debtors, and so that creditors can be made aware of their fate, this should be disclosed.

3

**Plan Structure**

*Calculation of Disposable Income*

12.     Section 1225(b) of the Code requires that, in the event of an objection, the Debtors distribute to general unsecured creditors the amount of the disposable income over a period of three years.  For obvious reasons, the calculation of "disposable income" is critical.

13.     Importantly, the Debtors, in an effort to side-step the obligation to commit disposable income over the period of the Plan, i.e., 3 years, have failed and/or refused to provide the Court and/or any interested party with the only manner in which it would be possible to determine that disposable income is being committed to payment.  To wit, the Debtors have not prepared or presented projections and, in fact, have testified that they do not intend to have such projections prepared.

14.     If and to the extent that the Debtors intend to rely upon the Monthly Operating Budget through July, 2019 [Docket No. 57-1] (the "Budget"), it is both incomplete and unreliable.  To wit, the "total income" in the Budget is projected to be $225,000 for the 2017 harvest.  During the Deposition, Mr. Mortellite testified that as of the filing of the Plan on September 6, 2017, the Debtors had already received $289,440.05 and expected another $40,000.  Thus, the total receipts for 2017 are now projected to be approximately $329,000.

15.     The current projected income of $329,000 is vastly at odds with the valuation of the crops set forth in the schedules docketed on June 8, 2017.  Docket No. 1, Case No. 17-21820 (ABA) at 8.

16.     Furthermore, the 2017 performance is equally inconsistent with the Budget's 2018 projected performance of $475,000.

4

17. During the Deposition, Mr. Mortellite testified that the 2018 performance will equate closely to the 2017 performance, i.e., $329,000.

18. Furthermore, during the Deposition, the parties learned for the first time that Mrs. Mortellite has an undisclosed source of income that has not been accounted for in any financial presentation before this Court. In fact, the parties learned, for the first time, that there is a bank account used by the Debtors for which account statements have not been provided, although they were obligated to provide them.

*Feasibility – 11 U.S.C. § 1226(a)(6)*

19. The Plan proposes to pay $3,000 per year for three (3) years and only to the creditors of the Individuals. The Plan provides no payment to the unsecured creditors of Blues Brothers.

20. Although the Plan payment could only be described as "paltry," it is even more so when the Court reviews both the creditor body and the extent to which the Debtors are seeking to be relieved of the obligation to pay creditors.

21. Most importantly, however, is that even the paltry payment is not feasible.

22. According to Mr. Mortellite, even if and when the $40,000 deferred income is received, after payment of business expenses, the Debtors will have approximately $36,000 to pay for the expenses of all Debtors for the period September 1, 2017 through June 1, 2017, i.e., a period of 9 months. Simple math demonstrates that this will equate to the sum of $4,000 per month to pay all expenses.

23. In the Budget, the Individuals have set forth a monthly budget of their personal expenses totaling $8,766. *Even if* all of the remaining funds were devoted to the Individual

Debtors' needs, it would cover *less than half* of the expenses they have set forth. Importantly, in this scenario, Blues Brothers' operation receives <u>nothing</u> for a period of 9 months.

24. Finally, the Court must not lose sight of the fact 11 U.S.C. § 1222(a)(2) requires costs of administration paid on the Effective Date of the Plan. Thus, the $36,000 will not be available to the Debtors' to fund on-going operations. Much of it will be earmarked to pay the administrative claims of the Trustee's counsel and Debtor's counsel and appraiser[2].

25. To the extent that the Court entertains the notion that the Debtors will continue to operate the farm and fund a Plan from its proceeds, the Trustee is concerned that the historical performance of the Debtors will be adversely impacted by the Debtors' decision to surrender equipment, thereby possibly leaving them without the tools necessary to perform the necessary farming activities. The Trustee assumes if this equipment was surplus, the surrender of this equipment would have occurred well before this critical juncture.

26. Upon information and belief, changes in federal immigration policy may adversely impact the Debtors' ability to harvest its crop due to an inability to fulfill its seasonal hiring needs. Furthermore, by surrendering its equipment, a lack of personnel could not be cured by use of machinery.

*Liquidation Analysis*

27. The Debtors have not submitted a liquidation analysis in support of their Plan. There is no way for the Trustee or the Court to determine whether the Plan meets the requirements of 11 U.S.C. § 1225(a)(4).

28. Curiously, we are now nearly four (4) months into the case and there is no clarity as to who owns the most valuable asset of the Debtors' Estates, i.e., **the blueberry plants**. This

---

[2] Debtor's counsel has stated that he will defer payment, if necessary. The Trustee will make no such concession.

factual determination is critical to an appropriate determination of the liquidation analysis <u>as well as</u> the disposable income of each separate debtor.

*Objection to Vesting of Assets*

29.　Section 1222(b)(10) denotes that "the vesting of property of the estate, on confirmation of the plan or at a later time, in the debtor or in any other entity…." This Plan is silent on this issue. The Trustee objects to the Plan to the extent that the Plan is intended to revest the Debtors' assets upon confirmation. To the contrary, the Trustee will demand that the assets not revest in the Debtors until the Plan is consummated. This provision will allow the Trustee the right to prevent the Debtors from improperly disposing of assets free of the Court's oversight.

**WHEREFORE**, as a result of the foregoing objections, the Trustee cannot and will not be recommending confirmation of the Debtors' Chapter 12 Plan as filed.

Respectfully,

**TRENK DIPASQUALE
DELLA FERA & SODONO, P.C.**,
*Counsel to Andrea Dobin,
Chapter 12 Trustee*

By:　　/s/Andrea Dobin
　　　ANDREA DOBIN

Dated: September 29, 2017

4843-9600-8238, v. 1

7