**TRENK, DiPASQUALE,**
**DELLA FERA & SODONO, P.C.**
427 Riverview Plaza
Trenton, New Jersey 08611
(609) 695-6070
(609) 695-6071
Andrea Dobin
Ross J. Switkes
*Counsel to Andrea Dobin, Chapter 12 Trustee*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>ANTHONY M. MORTELLITE, JR. and COLLEEN MORTELLITE,<br><br>Debtors. | Case No. 17-21818 (ABA)<br><br>Chapter 12<br><br>Honorable Andrew B. Altenburg, U.S.B.J. |
| In re:<br><br>BLUES BROTHERS, LLC,<br><br>Debtor. | Case No. 17-21820 (ABA)<br><br>Chapter 12<br><br>(Jointly Administered) |

**OBJECTION OF ANDREA DOBIN, CHAPTER 12 TRUSTEE TO CONFIRMATION OF DEBTORS' SECOND AMENDED CHAPTER 12 PLAN**

ANDREA DOBIN, Chapter 12 Trustee, by and through her undersigned counsel and by way of objection to confirmation of the proposed Second Amended Chapter 12 Plan of Anthony M. Mortellite, Jr. and Colleen Mortellite (the "Individuals") and Blues Brothers, LLC ("Blues Brothers," and collectively, the "Debtors") states as follows:

1. The Debtors filed a Chapter 12 Plan on September 6, 2017 (Docket No. 79) which was amended by the filing of an Amended Chapter 12 Plan on October 2, 2017 (Docket No. 101).

2. The Debtors failed to confirm a Chapter 12 Plan at the confirmation hearing held on October 5, 2017. In fact, the Court directed a verdict adverse to the Debtors as to feasibility at the earliest stages of the confirmation hearing. The Court provided the Debtors with fourteen (14) days to file a second modified plan. See Docket No. 115.

3. On October 19, 2017, the Debtors docketed a Second Amended Plan. Docket No. 130.

4. On October 20, 2017, the Court Entered an Order Scheduling Hearing on Confirmation on the Second Amended Plan. Docket No. 1333.

5. On October 26, 2017, Farm Credit East ("Farm Credit") filed a motion to compel payment of administrative expenses (the "Admin Claim Motion"). Docket No. 143. The Admin Claim Motion seeks payment of $158,262 as an administrative expense.

**Administrative Concerns**

6. <u>Plan Structure</u>: The Debtors have not substantively consolidated their cases, but have elected, instead, to submit a single Plan.

7. <u>Administrative Expense Claims</u>: The Plan proposes, as it must, to pay Chapter 12 Administrative Claims on the Effective Date. At the time of submission, the Debtors estimated that these claims totaled approximately $27,000.

8. The Trustee contends that this number is now understated because her professional fee estimates were provided on August 29, 2017. Since then, as the Debtors are

well-aware, the Trustee's professionals represented her in opposition to the Debtors' Plan and appeared at the Confirmation Hearing, and responded to the flurry of activity following the failure to confirm. At this time, the Trustee's professionals' fees alone are nearly twice that which is estimated in the Plan.

9. Furthermore, the Admin Claim Motion seeks allowance of a Chapter 12 Administrative Claim for Farm Credit East in the amount of $158,262. The allowance of this Chapter 12 Administrative Claim dooms this Plan and, frankly, the Debtors' effort to confirm <u>any</u> Plan.

10. <u>Disbursing Agent</u>: The Trustee respectfully requests that the Court direct that she serve as disbursing agent under the Plan and receive a five (5%) percent commission on distribution to creditors. In light of the proposed small dividend and, thus, the commission to be paid to the Trustee thereon, the Trustee should not be required to file a fee application for allowance of her commission as suggested by the Debtor in Section III(C)(i) of the Second Amended Plan (<u>see</u> page 15). Furthermore, the law is clear that the Trustee's commission is *in addition to* the sums to be paid to unsecured creditors under a Chapter 12 plan. See, <u>In re Winter</u>, 151 B.R. 278 (Bankr. W.D. Okla. 1993) (holding that trustee's fees and post-confirmation administrative expenses are not to be paid from funds to be paid to unsecured creditors under a plan).

**Plan Structure**

*Calculation of Disposable Income*

11. Section 1225(b) of the Code requires that, in the event of an objection, the Debtors distribute to general unsecured creditors the amount of the disposable income over a period of three years. For obvious reasons, the calculation of "disposable income" is critical.

3

12. In support of the Second Amended Plan, the Debtors have submitted projections prepared by an accountant (the "Projections"). Docket No. 153-1.[1] The projections have <u>no information</u> concerning the Individuals' possible disposable income, but, rather, show that Blues Brothers is disbursing $6,000 to the Individuals to support their lifestyle and no way to determine whether this is reasonable.

13. Furthermore, the "line item" for the "Household Expenses" is *not* a necessary expense of the Blues Brothers Estate highlighting the problems posed by the *ad hoc* consolidation of these Estates.

14. The Plan proposes to pay $3,000 per year for three (3) years for each group of creditors, i.e., the creditors of the Individuals and the creditors of Blues Brothers.

15. In apparent response to the Trustee's objection to the miniscule dividend, the Debtors now propose to force the Trustee to audit their books and records to make a determination whether or not there should be <u>more</u> disposable income paid to the creditors. This is unduly burdensome and will increase the administrative expenses in a foolhardy errand with the potential benefit destined to be dwarfed by the administrative expenses associated with such audit (assuming, for the sake of this objection, that the Debtors intend to pay the Trustee for this service, which is far from clear).

16. Although the Plan payment could only be described as "paltry," it is even more so when the Court reviews both the creditor body and the extent to which the Debtors are seeking to be relieved of the obligation to pay creditors.

---

[1] Importantly, the version of the projections docketed by the Debtors is incomplete. The versions served on the Trustee and counsel to the secured creditor do not suffer from this particular defect.

4

*Feasibility – 11 U.S.C. § 1225(a)(6)*

17. Most importantly, however, is that even the paltry payment is not <u>feasible</u>.

18. The determination of feasibility is based upon the Projections. The Trustee objected to the First Amended Plan because the Debtor had no projections. That most basic error has now been cured, but the Projections are problematic in their own right.

*As to Income Projections*

19. The Projections are entirely fictitious and not grounded in the facts as previously presented before this Court. It is well-established that the Debtors make the entirety of their income during July and August when the blueberries are harvested. Indeed, in Mr. Mortellite's declaration in support of the Debtors' first day motions he indicated that the harvesting season starts in June and ends in July each year. Indeed, the declaration provides:

> The harvesting season starts in June and ends in July of each year. The harvesting and packaging is very labor intensive. Each June, Blues Brothers hires approximately ninety workers from harvest and package is blueberry and blackberry crop (the "Crop"), and by the end of July all of its Crop is harvested, packaged and sold.

Docket No. 9, ¶ 10. The Debtor presented projections which demonstrate just that. <u>See</u> Docket No. 57-1.

20. Now, without explanation or hesitation, the Debtors' Accountant's Projections shows income starting in April 2018, with a peak in June and July, entirely **<u>contrary</u>** to the Debtors' prior explanation, testimony and certifications before this Court. This change in income strategy wholly undermines the reliability of the Projections as it would appear that the Debtors' Accountant lacks sufficient familiarity with the Debtors' business.

21. The Projections also include a curious line item titled "Gift- Bill Mortellite." Based upon its placement on the Projection, it would appear that the Debtor intends to *make* a

5

gift to "Bill Mortellite," however, the Plan states "to the extent necessary" that the Debtor's brother will make up any shortfall in the Debtors' income. Docket No. 130 at 9. Curiously, it now appears that Bill Mortellite's contribution will be required, not in the event of an unexpected shortfall, but, rather, to even meet the basic Plan payments. For the period October, 2017-September 2018, Bill Mortellite must contribute $9,000 to make the Plan feasible. For the next 12 months, he must contribute $54,500 to make the Plan feasible. The following year, he must contribute $53,000 to make the Plan feasible.

22. As laid out in the Projections, these gifts are to Blues Brothers and not the Individuals. If the gift was to the Individuals, the Household Expense line would simply be reduced by the amount of money that the Individuals were to receive from Bill Mortellite. To the contrary, all of these payments are labeled "gifts" and they are flowing to the corporation, Blues Brothers. It strains credibility to think that a businessman would give a business over $100,000 over a 3 year period wanting nothing in return, not even a promissory note or request for repayment.

23. The record contains no information about Bill Mortellite. Although he appears on the Debtors' witness list, no documents are provided relating to him or his financial condition. The Trustee believes that Bill Mortellite's wherewithal to make the "gifts" disclosed in the Projections is now a critical piece to an overall finding of feasibility. Testimony alone will be insufficient to meet the proofs required, much like the Individuals' testimony was insufficient during prior hearings.

24. To be clear, in the absence of Bill Mortellite's contribution, this Plan will fail in dramatic fashion.

6

*As to Expense Projections*

25.     The Debtors have surrendered various pieces of equipment.  See Docket No. 130, Section III(A) & (B).  The Trustee assumes that the Debtor acquired this equipment because it was necessary for the farming operations.  Now that they have been surrendered, a change in the costs associated with the operation of the farm is to be expected.  How will the Debtor get access to the equipment necessary to farm?

26.     The Projections do not have any allowance for renting or purchasing new equipment and, clearly, the Debtors are not credit-worthy.

*Liquidation Analysis*

27.     The Debtors have not submitted a liquidation analysis in support of their Plan.  There is no way for the Trustee or the Court to determine whether the Plan meets the requirements of 11 U.S.C. § 1225(a)(4).

28.     Curiously, we are several months into the case and there is no clarity as to who owns the most valuable asset of the Debtors' Estates, i.e., **the blueberry plants**.  This factual determination is critical to an appropriate determination of the liquidation analysis as well as the disposable income of each separate debtor.

*Objection to Vesting of Assets*

29.     Section 1222(b)(10) denotes that "the vesting of property of the estate, on confirmation of the plan or at a later time, in the debtor or in any other entity…."  This Plan is silent on this issue.  The Trustee objects to the Plan to the extent that the Plan is intended to revest the Debtors' assets upon confirmation.  To the contrary, the Trustee will demand that the assets not revest in the Debtors until the Plan is consummated.  This provision will allow the

7

Trustee the right to prevent the Debtors from improperly disposing of assets free of the Court's oversight until such time as the Plan is consummated or Court approval is obtained.

## CONCLUSION

Based upon the foregoing objections, the Trustee cannot and will not be recommending confirmation of the Debtors' Chapter 12 Plan as filed. The Trustee reserves the right to raise additional objections at the confirmation hearing.

    Respectfully,

    **TRENK DIPASQUALE**
    **DELLA FERA & SODONO, P.C.,**
    *Counsel to Andrea Dobin,*
    *Chapter 12 Trustee*

    By: /s/Andrea Dobin
        ANDREA DOBIN

Dated: November 9, 2017

4843-9600-8238, v. 1