| UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY | |
|---|---|
| In Re: | Case No.: 17-21818-ABA |
| | Chapter: 12 |
| Anthony M. Mortellite, Jr. and Colleen Mortellite, Debtors | Jointly Administered |
| Blues Brothers, LLC, Debtor | Case No.: 17-21820-ABA |
| | Chapter: 12 |
| | Judge: Andrew B. Altenburg, Jr. |

*[FILED stamp: JEANNE A. NAUGHTON, CLERK, JAN 11 2018, U.S. BANKRUPTCY COURT, CAMDEN, N.J., DEPUTY]*

## MEMORANDUM DECISION

Before the court is confirmation of the Second Modified Chapter 12 Plan of Reorganization ("Second Modified Plan") of Anthony M. Mortellite, Jr. and Colleen Mortellite, (collectively, "Mortellite") and Blues Brothers, LLC ("Blues Brothers," collectively with Mortellite, "Debtors"). Upon evidence presented, the confirmation of the Second Modified Plan is hereby denied and the case shall be dismissed.

## JURISDICTION AND VENUE

This matter before the court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (L), and (O), and the court has jurisdiction pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157(a) and the Standing Order of Reference issued by the United States District Court for the District of New Jersey on July 23, 1984, as amended on September 18, 2012, referring all bankruptcy cases to the bankruptcy court. The following constitutes this court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.

## PROCEDURAL HISTORY

On June 6, 2017, the Debtors filed their voluntary chapter 12 bankruptcy petitions.[1] On that same day, the Debtors filed their Motion for Joint Administration, which was granted. The Debtors filed a Chapter 12 Plan of Reorganization on September 6, 2017, Doc. No. 79, but prior to the confirmation hearing, timely filed a modified chapter 12 plan ("First Modified Plan"). Doc. No. 101. Farm Credit East, ACA ("FCE" or "Farm Credit"), other creditors, and Andrea Dobin,

---

[1] There has been no challenge as to whether the Debtors qualify for chapter 12 relief under the definitions set forth in sections 101(19) or 101(20) of the Bankruptcy Code.

Esquire, the Chapter 12 Trustee ("Trustee"), objected to confirmation of the First Modified Plan.[2] The confirmation hearing was held on October 5, 2017.

At confirmation, the Debtors presented Mr. Mortellite as their only witness. At the close of testimony, FCE petitioned the court to deny confirmation because based on the evidence submitted, the First Modified Plan was not feasible. The Trustee joined FCE in its petition. The court agreed, and for the reasons set forth orally on the record, the court entered an order denying confirmation of the First Modified Plan on feasibility grounds. Doc. No. 115. That order has not been challenged or set aside. Nevertheless, the court allowed the Debtors to file another modified plan pursuant to section 1223.[3] On October 19, 2017, the Debtors filed their Second Modified Plan. Doc. No. 130. Confirmation was set for November 17, 2017.

On October 26, 2017, FCE filed a Motion to Compel Payment of Administrative Expenses ("Claim Motion"). Doc. No. 143. The Claim Motion was also set to be heard on November 17, 2017 in conjunction with the confirmation hearing. On November 17, 2017, the court heard testimony from the Debtors' witnesses. Testimony could not be completed by the end of the day but the court addressed the Claim Motion, expressed its concerns, and requested further submissions from the parties. Confirmation and the Claim Motion were carried to December 1, 2017. The parties submitted their pleadings in support of their positions with regard to the Claim Motion prior to the hearing on December 1, 2017.

On December 1, 2017, the court received the remaining testimony and arguments of counsel. Once concluded, the court rendered its oral opinion on the Claim Motion finding that FCE was entitled to an administrative claim in the amount of $158,262 (the "Allowed Administrative

---

[2] It should be noted that in its objection to the Debtors' First Modified Plan, FCE indicated that it would be seeking payment of an administrative claim that would also impact the feasibility of the plan. Doc. No. 97.

[3] "The debtor may modify the plan at any time before confirmation, but may not modify the plan so that the plan as modified fails to meet the requirements of section 1222 of this title." 11 U.S.C. § 1223(a). "While Rule 3019 governs modification of chapter 9 and 11 plans before confirmation, and Rule 3015(h) governs modification of a chapter 12 plan after confirmation, there are no special provisions in the rules for modification of a chapter 12 plan prior to confirmation." Part 1 Collier Pamphlet Edition 2017, p. 1047 (Alan N. Resnik & Henry J. Sommer eds., Matthew Bender). The Debtors had complied with sections 1221 and 1224. Accordingly, the court allowed the Debtors to promptly file a modified plan upon denial of confirmation of the First Modified Plan. The initial requirement of 11 U.S.C. § 1223 was met because the original plan had not been confirmed. Also, section 1208(c)(5) was not implicated because that requires denial of confirmation of a plan under section 1225 **AND** denial of a request for additional time to file another plan or a modification of a plan. This language clearly contemplates that modification can be made after denial of an original plan. Here, the court took the Debtors' arguments when confirmation of the First Modified Plan was denied as a timely request to allow plan modification. Finally, although probably not necessary, based upon the plain and unambiguous language of the statutes and rules above, the court can exercise its authority under section 105 to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. Since section 1208(c)(5) foresees modification upon denial of the original plan, confirmation is a goal provided for in the bankruptcy process, and under section 1123 there is no time limit to propose a modified plan before confirmation, it was entirely appropriate to allow the Debtors to attempt to propose a plan modification upon denial of confirmation of the First Modified Plan.

Claim").[4] Confirmation was taken under advisement, and the parties were requested to provide further submissions supporting their positions in light of the evidence submitted. All post-hearing submissions have now been made. Doc. Nos. 180, 181, 184 and 185. This matter is now ripe for disposition.

## FINDINGS OF FACT[5]

Blues Brothers is a limited liability company whose only members are the individual Mortellites. Blues Brothers operates a 109 acre[6] blueberry and blackberry farm in Winslow Township, New Jersey. The real property on which the farm operates is owned by the Mortellites individually, and they value the property at $600,000. Doc. No. 1, p.11. The crops are owned by Blues Brothers, and it valued them at $475,800 as of the petition date.[7] Doc. No. 1, p. 8 in Case No. 17-21820-ABA. The Debtors and FCE stipulated that the value of the machinery and equipment to which FCE's lien attaches is $123,275. Through these jointly-administered chapter 12 cases, the Debtors seek confirmation of a joint plan of reorganization[8] to allow them to continue to operate the farm.

In their First Modified Plan, the Debtors had attempted to address the claims of their various creditors, to reduce the secured claim of FCE pursuant to section 506(a) of the Bankruptcy Code from $1,663,352.46[9] to $600,000, and to pay a *pro rata* distribution to their unsecured creditors. FCE, along with other creditors and the Chapter 12 Trustee, had objected to the Debtors' plan on a number of grounds, but primarily as to feasibility and valuation. In particular, FCE had asserted that the Debtors had undervalued the farm by more than $1.5 million,[10] the plan did not provide for the full payment of its secured claim or administrative claim, and the Debtors had failed to provide proof of sufficient cash flow to meet their burden of proof on feasibility. The

---

[4] On December 8, 2017, the court entered its *Order Granting Motion Allowing Administrative Priority Claim* and also issued a written Memorandum Decision following its oral decision. Doc. Nos. 178 and 179. That order has not been challenged or set aside.

[5] The Procedural History set forth above is incorporated into the court's Findings of Fact.

[6] Although Mr. Mortellite and the witnesses provided conflicting testimony as to the actual acreage, it appears that 109 is the most consistent, relied upon, and likely number for purposes of this opinion.

[7] Mr. Mortellite initially took the position, through the Debtors' bankruptcy petitions, that Blues Brothers solely owned the crops on the farm but later changed his position, interestingly during contested cash collateral proceedings, to indicate he was a part owner of the crops with Blues Brothers. However, in light of the testimony of the Debtors' own accountant and other testimony elicited from the witnesses by counsel to FCE—including testimony that the crops were listed solely on Blues Brothers' tax returns—the court finds that Mr. Mortellite's position is not credible, is unbelievable and perhaps even lacks good faith.

[8] In connection with the First Modified Plan, the court ruled that the Debtors filing of a joint plan, rather than two separate plans, was acceptable—of course subject to sections 1207, 1222, 1225 and 1226 of the Bankruptcy Code.

[9] FCE timely filed a proof of claim asserting a secured claim of $1,663,352.46. The amount and validity of that claim has not been challenged.

[10] The Debtors contend their blueberry farm's replacement value is $600,000. On the other hand, FCE presented a value that is significantly higher than the Debtors—$2,300,000.

court had denied confirmation based on the Debtors' failure to meet their burden with regard to feasibility, without considering any other factors such as valuation. The court yet gave the Debtors the opportunity to file a modified plan, but in doing so it cautioned the Debtors that it had concerns about their treatment of FCE's claim.

The Debtors' Second Modified Plan is substantially identical to their First Modified Plan, except that the Mortellites will contribute additional income; Anthony M. Mortellite, Mr. Mortellite's brother, will contribute funds to cover shortfalls; and the Debtors' professionals will defer any allowed compensation to be paid in later years as opposed to immediately upon approval.[11] The Second Modified Plan still seeks to reduce the secured claim of FCE pursuant to section 506(a) of the Bankruptcy Code to $600,000 and makes no reference to the administrative claim of FCE raised in FCE's objection to the original and modified plans. Prior to the hearing, the Debtors resolved all objections to confirmation except for those of FCE, the Trustee and Lance Henry.[12] As a result, the primary issues at the confirmation hearing of the Second Modified Plan were: 1) the value of the farm; 2) feasibility of the plan; and 3) whether FCE is entitled to payment of its administrative expense claim.

As to the valuation of the farm, the Debtors and FCE offered testimony of expert appraisers. The Debtors' expert testified that the farm is worth $600,000 based upon a sales comparison approach of the raw land value of the farm, without taking the operation aspect of the farm or crops into consideration. FCE's expert valued the farm at $2,300,000 which includes the value of the crops, explaining that because the Debtors' property is an active and operating blueberry farm with matured permanent planted crops, the value of those crops must be taken into account in order to correctly determine the farm's replacement value.

As to feasibility of the plan, the Debtors relied on the testimony of their accountant, Mr. Mortellite, and Anthony Mortellite. A budget was submitted and the Debtors' expert stated that it was tight with not much room for change. Any shortfalls would be covered by Anthony Mortellite. It was abundantly clear that the Debtors could in no way make an immediate lump sum payment of the Allowed Administrative Claim. Finally, and although that number was unknown, there was a limit to what Anthony Mortellite was willing to actually contribute.

As to payment of the Allowed Administrative Claim, the court orally ruled at the hearing, followed by a Memorandum Decision and Order entered December 8, 2017 (Doc. Nos. 178, 179), that the claim was a priority claim under section 507 of the Bankruptcy Code and must be paid as part of the Debtors' plan (although this possibility has been repeatedly ignored by the Debtors in their modified plans). Since the Debtors acknowledged that they could not pay this administrative claim in accordance with their Second Modified Plan's treatment of other administrative claimants, the Debtors then proposed to use their "slush fund," originally reserved for unanticipated

---

[11] The court recognizes that the Mortellites will also contribute any additional excess monthly disposable income to the extent any exists during the life of the plan.

[12] Lance Henry filed his objection to confirmation, Doc. No. 96, but failed to prosecute his objection on the return dates of the confirmation of the Second Modified plan. Moreover, the basis of the objection would not prevent plan confirmation. The court orally overruled the objection of Mr. Henry and provided its reasoning for doing so on the record on December 1, 2017. That decision is incorporated herein.

expenses/capital improvements in their tight budget, to pay the Allowed Administrative Claim over a period of time.[13] Doc. No. 180.

At the close of the record on confirmation, the court expressed its concerns about plan feasibility and valuation. Indeed the court implored the Debtors to submit a pleading to "convince [the court] how this plan works" and to explain how it can ignore the value of the crops. The court provided the parties with the opportunity to address these concerns. In its instruction, the court <u>was clear</u> that the parties' positions must be based on the record that had been established and now closed; no new evidence or certifications would be permitted. It should also be noted that the Debtors conceded that if the court accepted FCE's expert's testimony, the plan was not feasible.

Unfortunately, the Debtors' post-confirmation hearing submission does not assist the court in its decision as it contains arguments already made, attempts to rely on evidence outside the record, fails to address specific questions raised, and appears to be nothing more than an attempt to impermissibly or improperly modify the plan in the face of challenged feasibility. Meanwhile, except for the court agreeing with the Trustee and FCE that new evidence cannot be considered, it found that their post-confirmation hearing submissions are of no assistance in its decision either. No party argued why the court should accept their expert's approach over the others'.

## DISCUSSION

The court is convinced that the Debtors are sincere about their desire to save the farm and to continue its operation into the distant future. The court is also convinced that Mr. Mortellite believes that the Debtors can afford the plan payments and thus successfully reorganize. But this court cannot decide this case on Mr. Mortellite's subjective thoughts. Instead, it must use an objective standard based upon the evidence presented to it. *In re Lockard*, 234 B.R. 484, 492 (Bankr. W.D. Mo. 1999).

Section 1225 of the Bankruptcy Code sets out the standards for confirmation of a plan in chapter 12 cases. For purposes of this case, the relevant portions of that statute provide:

(a) Except as provided in subsection (b), the court shall confirm a plan if— . . .

    (3) the plan has been proposed in good faith and not by any means forbidden by law; . . .

    (5) with respect to each allowed secured claim provided for by the plan—.

. .

        (B)(i) the plan provides that the holder of such claim retain the lien

---

[13] 11 U.S.C. § 1222(a)(1) provides a unique advantage to a debtor farmer by allowing priority claims under section 507 to be paid over the life of a plan, unlike chapter 11 cases where administrative claims must be paid in full on the effective date. *See* 11 U.S.C. § 1129(a)(9)(A). In addition, a chapter 12 plan can designate separate classes of unsecured claims, provided that placing a claim in a separate class does not constitute unfair discrimination. 11 U.S.C. § 1222(b)(1).

> securing such claim; and
>
>> (ii) the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim; or . . .
>
> (6) the debtor will be able to make all payments under the plan and to comply with the plan . . . .

11 U.S.C. § 1225. Here, as in most cases, good faith, valuation and feasibility are directly in question and inextricably intertwined. Ultimately, "[t]he Chapter 12 debtor bears the burden of proving that his proposed plan satisfies all of the requirements for confirmation as set out under section 1225(a)." *In re Torelli*, 338 B.R. 390, 395 (Bankr. E.D. Ark. 2006). Of course, "[a] determination of feasibility is 'never certain, particularly in farm situations,' but '[n]evertheless, the ultimate burden of establishing feasibility, as with all elements of confirmation, rests on the debtor.'" *In re Terry Properties, LLC*, 569 B.R. 76, 86 (Bankr. W.D. Va. 2017) (citing *In re Keith's Tree Farms*, 519 B.R. 628, 637 (Bankr. W.D. Va. 2014)).

For confirmation, subsection (a)(5)(B) of section 1225 addresses valuation of secured claims and permits a debtor to retain possession of the property securing a creditor's claim if the debtor meets his or her burden of proving that a secured creditor who has not accepted the plan will not receive less than its allowed secured claim. 11 U.S.C. § 1225(a)(5)(B)(i), (ii). Valuation and plan feasibility go arm in arm. Whenever a plan proposes to pay the present value of a secured claim, whether the secured claim is being paid in full or being reduced under section 506(a) of the Bankruptcy Code, there must be a likelihood that the debtor has sufficient disposable income to pay the claim as required by the Code. *In re Fenske*, 96 B.R. 244, 248 (Bankr. D.N.D. 1988) ("The necessity of preserving a secured creditor's interest impacts upon the second relevant confirmation element which is that the debtor must be able to make all payments under the plan.").

To make the determination under 11 U.S.C. § 1225(a)(5)(B) and ultimately feasibility, the value of the farmland must first be determined. The Supreme Court in *Associates Commercial Corp. v. Rash*, 520 U.S. 953 (1997), established that the proper valuation method is replacement value. In defining replacement value, the Court stated, "we hold, the value of the property (and thus the amount of the secured claim under § 506(a)) *is the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller.*" 520 U.S. at 960 (emphasis added). In sum, replacement value is the cost incurred *"to obtain a like asset for the same 'proposed . . . use.'"* 520 U.S. at 965 (emphasis added). Finally, bankruptcy courts, as triers of fact, are to establish replacement value on the basis of the evidence presented to them. *Id.* n. 6.

Here, the Debtors' desire is to keep the real property and continue using it in their current farming operation. They claim that FCE's allowed secured claim against the real property should be fixed at $600,000, a replacement value determined by their appraisal expert solely on a sales comparison approach. FCE contends the farm's replacement value is $2,300,000 determined by its appraisal expert also on, *inter alia*, a sales comparison approach.

The Debtors' expert testified that his testimony represented solely the raw land value, without taking any operation aspect of the farm into consideration. He also explained because farmlands are not bought to be leased out, the income capitalization approach is inapplicable here. In addition, he explained that he disregarded the cost approach because the property can only be used as agricultural land and has no potential for future development. He did not offer credible testimony of the value of the crops. The expert confirmed that he arrived at his appraisal value of $600,000 solely based on a comparable sales analysis of 10 agricultural properties that he believed had similar characteristics to the Debtors' blueberry farm. He explained that the 10 properties he evaluated are similar to the subject property, because they are also limited to agricultural use only and the quality and quantity of tillable lands are similar to that of the Debtors' blueberry farm.

However, the court notes that out of the 10 properties evaluated, only one of them was actually a blueberry farm, and the expert testified that the sale was a private sale (with no broker involved) with an "unaware" seller who ultimately was not completely happy with the sale and presumably, the sale price. Several of the comparable sales also involved private sales or involved lands that did not have permanent plantings, like blueberries, growing on them. On cross examination, FCE's counsel exposed flaws in the expert's testimony that persuaded the court that there was some speculation as to value based upon facts perceived by the expert as opposed to actually speaking to parties or brokers, and that the expert's testimony may not be credible in some instances.[14] Sales comparisons without full knowledge of the facts, ignoring operations and differences in crops, and involving private or liquidation sales, can in no way assist in determining motivation of a "willing" buyer from a "willing" seller. Based upon the expert's testimony, the court is not sufficiently convinced that the Debtors' expert provided testimony evidencing what price a willing buyer in the debtor's business would pay to obtain like property from a willing seller, i.e., to obtain a like asset for the same proposed use.

On the other hand, FCE's expert testified that her estimation included the value of the blueberry bushes. She explained that because the Debtors' property is an active blueberry farm with matured blueberry bushes, the value of those blueberry bushes, as permanent plantings, must be taken into account to correctly determine the farm's replacement value. More importantly, FCE's expert compared the subject property to sales of other blueberry farms. This helps the court to determine what price a willing buyer in the debtor's business would pay to obtain a like asset for the same proposed use. In effect, this expert compared blueberries to blueberries while the Debtors' expert compared blueberries to blueberries but also to tomatoes, corn, soybeans and other non-permanent plantings. The Debtors are blueberry farmers. They grow a specific crop with specific traits. The court must look to what a willing buyer in the Debtors' business would pay to obtain like property for the same proposed use. When evidence exists of what operating blueberry farms sell for and those sales take into consideration the value of the operations and crops, the court cannot ignore that evidence.[15]

---

[14] For example, the court finds it implausible that mature blueberry crops, which are permanent plantings on the land, that yield and have yielded and will yield product for a period of time (and valued by the Debtors at $475,800) in no way have an impact on what a willing buyer would pay a willing seller.

[15] The Debtors would likely argue that the sales information about the previous blueberry farm sales is unreliable because of how old they are, but the court is not persuaded. The Debtors' expert recognized that the sale of blueberry farms is rare. So it is not surprising to the court that the sales are old. But what is clear from FCE's expert's testimony

The court also considers the testimony elicited in this case by counsel to FCE from the parties' experts and Mr. Mortellite concerning the crops. Clearly, blueberries are specialized agricultural product and are permanent plantings. As permanent plants, blueberries must reach maturity before a farm can start producing berries that can be sold and this takes several years to do. As a result, the plants commit the land to that particular use for the economic life of the blueberries, which according to Mr. Mortellite can be 40 years (although yields can diminish over time). Indeed, here, the Debtors invested years cultivating the blueberry bushes to maturity, generated income therefrom (even $1 million of income in their best year), and the bushes are expected to generate income for decades to come. Unquestionably, the court must consider the value these mature permanent plantings contribute to the land. Moreover, the Debtors plan on continuing their farm operation. It is nonsensical to suggest that these mature permanent plantings and the Debtors' intended use should be overlooked, especially since the land is restricted solely to agricultural use. This is an on-going farm operation (as opposed to a liquidation or other commercial venture). Consequently, it must be valued as such. *See In re Donato*, 253 B.R. 151, 155 (M.D. Pa. 2000) (chapter 13 case[16]); *In re Briseno*, 496 B.R. 509, 517 (Bankr. N.D. Ill. 2013) (chapter 13 case); *In re Brace*, 163 B.R. 274, 277 (Bankr. W.D. Pa. 1994) (chapter 12); *In re Anderson*, 88 B.R. 877, 886 (Bankr. N.D. Ind. 1988) (chapter 12 case). To ignore the crops' value and intended use would be to ignore the Supreme Court's direction in *Rash* to ascertain what a willing buyer in the debtor's business would pay to obtain a like asset for the same proposed use. *See* 520 U.S. at 965. It is simply not conceivable that the Debtors' real property would be used for anything other than its current use nor was there any credible testimony in that regard.

The court finds the testimony of FCE's expert more compelling as it reflects the value of the Debtors' property as an on-going farm operation whereas the Debtors' appraisal value is not a true reflection of its value in the market when used as its intended use. The Debtors did not effectively challenge or rebut that testimony of FCE's expert and the court found the testimony sound. As such, the court will accept $2,300,000 as the proper value of the real property.

As a result, the Debtors' plan fails under 11 U.S.C. § 1225(a)(5), because FCE's secured claim of $1,663,352.46 as adjusted by payments made in the case, must be paid in full. In addition, as the Debtors conceded at confirmation, because FCE is entitled to payment of its secured claim in full, the plan is not feasible under 11 U.S.C. § 1225(a)(6).[17]

---

is that when a blueberry farm is sold, it is sold with operations and crops considered in the sale price, not just the property alone as the Debtors would have this court accept.

[16] Chapter 12 was primarily modeled after Chapter 13, and therefore, the case law developed under comparable provisions of Chapter 13 provide guidance in analyzing Chapter 12 cases. See *In re LaRosa Greenhouse, LLP*, 565 B.R. 304 (Bankr. D.N.J. 2017); see also 8 *Collier on Bankruptcy*, ¶¶ 1222.01, 1222.03[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

[17] Interestingly, if the court accepted the Debtors' values—property at $600,000, crops at $475,800, and machinery and equipment at $123,275, for a total of $1,199,075 under the plan—that would take more than 18 years to pay off, which raises confirmation concerns. Moreover, the Debtors' new proposal to pay the Allowed Administrative Claim, by taking from funds in the budget earmarked for other items leads this court to conclude that the plan is not feasible. The Debtors and their professional testified that the budget was tight and all items listed were necessary. To suggest

## CONCLUSION

The Debtors have failed to meet their burden of proving that all the requirements for confirmation have been met and as such, the case shall be dismissed.

An appropriate judgment has been entered consistent with this decision.

The court reserves the right to revise its findings of fact and conclusions of law.

/s/ Andrew B. Altenburg, Jr.
United States Bankruptcy Judge

Dated: January 11, 2018

---

now that funds can be shifted around to address the shortcomings of the plan is disingenuous, perhaps in bad faith, and a desperate attempt to confirm an otherwise unconfirmable plan.

United States Bankruptcy Court
District of New Jersey

In re:                                                                 Case No. 17-21818-ABA
Anthony M Mortellite, Jr                                               Chapter 12
Colleen T Mortellite
        Debtors

# CERTIFICATE OF NOTICE

District/off: 0312-1          User: admin              Page 1 of 1           Date Rcvd: Jan 11, 2018
                              Form ID: pdf903          Total Noticed: 1

Notice by first class mail was sent to the following persons/entities by the Bankruptcy Noticing Center on
Jan 13, 2018.
db/jdb          +Anthony M Mortellite, Jr,    Colleen T Mortellite,    564 11th St.,    Hammonton, NJ 08037-8468

Notice by electronic transmission was sent to the following persons/entities by the Bankruptcy Noticing Center.
NONE.                                                                                              TOTAL: 0

            ***** BYPASSED RECIPIENTS *****
NONE.                                                                                              TOTAL: 0

Addresses marked '+' were corrected by inserting the ZIP or replacing an incorrect ZIP.
USPS regulations require that automation-compatible mail display the correct ZIP.

Transmission times for electronic delivery are Eastern Time zone.


**I, Joseph Speetjens, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.**

**Meeting of Creditor Notices only (Official Form 309): Pursuant to Fed. R. Bank. P. 2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

Date: Jan 13, 2018                                     Signature:  /s/Joseph Speetjens

---

# CM/ECF NOTICE OF ELECTRONIC FILING

The following persons/entities were sent notice through the court's CM/ECF electronic mail (Email)
system on January 11, 2018 at the address(es) listed below:
              Andrea   Dobin     on behalf of Trustee Andrea   Dobin adobin@trenklawfirm.com
              Andrea   Dobin    ecftrusteead@trenklawfirm.com, NJ55@ecfcbis.com
              CherylLynn   Walters    on behalf of Creditor    Township of Winslow cwalters@prlawoffice.com
              David A. Kasen     on behalf of Joint Debtor Colleen T Mortellite dkasen@kasenlaw.com
              David A. Kasen     on behalf of Unknown Role Type    Blues Brothers, LLC dkasen@kasenlaw.com
              David A. Kasen     on behalf of Debtor Anthony M Mortellite, Jr dkasen@kasenlaw.com
              David A. Kasen     on behalf of Debtor    Blues Brothers, LLC dkasen@kasenlaw.com
              Denise E. Carlon    on behalf of Creditor    Kubota Credit Corporation dcarlon@kmllawgroup.com,
               bkgroup@kmllawgroup.com
              Eamonn  O'Hagan     on behalf of Creditor    United States Department of Agriculture - Farm Serivce
               Agency eamonn.ohagan@usdoj.gov
              Erin  Darden    on behalf of Creditor    United States of America erin.darden@usdoj.gov
              Heather Lynn  Anderson    on behalf of Creditor    State Of New Jersey Division Of Taxation
               heather.anderson@law.dol.lps.state.nj.us
              Jenny R. Kasen    on behalf of Debtor Anthony M Mortellite, Jr jkasen@kasenlaw.com,
               dkasen@kasenlaw.com
              Jenny R. Kasen    on behalf of Joint Debtor Colleen T Mortellite jkasen@kasenlaw.com,
               dkasen@kasenlaw.com
              Jenny R. Kasen    on behalf of Debtor    Blues Brothers, LLC jkasen@kasenlaw.com,
               dkasen@kasenlaw.com
              John E. Corbett    on behalf of Creditor Lance  Henry jecorbett@corbettlaw.net
              John R. Morton, Jr.    on behalf of Creditor    Americredit Financial Services, Inc., d/b/a GM
               Financial ecfmail@mortoncraig.com, mortoncraigecf@gmail.com
              John R. Morton, Jr.    on behalf of Creditor    Wells Fargo Bank, N.A., d/b/a Wells Fargo Dealer
               Services ecfmail@mortoncraig.com, mortoncraigecf@gmail.com
              Joseph A McCormick, Jr.    on behalf of Creditor    Deere & Company jmccormick@mccormicknjlaw.com,
               karen@mccormicknjlaw.com;Lorraine@mccormicknjlaw.com;Kathleen@mccormicknjlaw.com;Karen@mccormickn
               jlaw.com
              Marshall T. Kizner    on behalf of Creditor    Farm Credit East, ACA mkizner@stark-stark.com
              Rebecca Ann Solarz    on behalf of Creditor    Kubota Credit Corporation rsolarz@kmllawgroup.com
              Ross J. Switkes    on behalf of Trustee Andrea   Dobin rswitkes@trenklawfirm.com
              Steven P. Kelly    on behalf of Creditor    Arvest Central Mortgage Company
               skelly@sterneisenberg.com, bkecf@sterneisenberg.com
              Timothy P. Duggan    on behalf of Creditor    Farm Credit East, ACA tduggan@stark-stark.com
              U.S. Trustee     USTPRegion03.NE.ECF@usdoj.gov
              Walter F. Gavigan, Jr.    on behalf of Creditor    Lee Rain, Inc. wgavigan@grucciopepper.com,
               jlynch@grucciopepper.com;r53898@notify.bestcase.com
              William E. Craig    on behalf of Creditor    Wells Fargo Bank, N.A., d/b/a Wells Fargo Dealer
               Services mortoncraigecf@gmail.com, mortoncraigecf@gmail.com
                                                                                             TOTAL: 26